PMC/RAU/vd USAO#2011R00195

```
                                              FILED
                                         U.S. DISTRICT COURT
                                         DISTRICT OF MARYLAND

           UNITED STATES DISTRICT COURT   2011 DEC -1  A 11: 14
           FOR THE DISTRICT OF MARYLAND
                                            CLERK'S OFFICE
                                             AT BALTIMORE

                                          BY_____DEPUTY
```

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| v. | : | CRIMINAL NO. MJG-11-0651 |
| ANDREAS KONSTANTINIDIS | : | (18 U.S.C. § 1519; Obstruction of Justice) |
| Defendant | : | |

...oooOooo...

## INFORMATION

### Count 1

The United States Attorney for the District of Maryland and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice hereby charge:

At all times relevant to this Criminal Information:

1. Defendant Andreas Konstantinidis was the Chief Engineer of the M/V Aquarosa, a 33,005 gross ton ocean-going bulk carrier cargo ship built in China and delivered in June 2010. The *M/V Aquarosa* was approximately 623 feet in length, was registered in Malta and had an International Maritime Organization (IMO) number of 9506708.

3. The *M/V Aquarosa* had an engine department headed by a Chief Engineer, and assisted by a Second Engineer, Third Engineer, Fourth Engineer, Wiper, Oiler, Electrician and Fitter. The Chief Engineer reported directly to the Master of the vessel and to shore-based managers and had overall responsibility for the operation of the engine department, including

making entries in the Oil Record Book, a required log regularly inspected by the United States Coast Guard.

4. The operation of large marine vessels like the *M/V Aquarosa* generates large quantities of oily sludge and oily waste:

    a. Oily sludge is generated during the process of purifying fuel oil, lubricating oil, and other petroleum products, so that these products can be used in the engines on board the vessel. The oily sludge generated as a result of this process is stored on board the vessel in sludge tanks. Sludge may properly be disposed of either by incineration on board the vessel or by offloading it at a port through the use of a licensed hauler and disposal facility.

    b. Engine Department operations also generate large quantities of oil contaminated bilge waste created when water mixes in the bottom of the vessel, known as the "bilges," with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. These "oily mixtures" are often referred to as "bilge waste," "bilge slops," and "slops from bilges," and are collected, stored, and processed to separate the water from the oil and other wastes using a pollution prevention control device known as an Oily Water Separator (often referred to as an O.W.S.) and oil-sensing device known as an Oil Content Monitor. Bilge waste may only be discharged overboard after passing through an Oily Water Separator to ensure that it contains fifteen (15) parts per million ("ppm") or less of oil, as measured by the Oil Content Monitor. If the Oil Content Monitor detects an oil content of greater than 15 ppm in the effluent, it sounds an

alarm, and shuts down the pumps to prevent the discharge of greater than 15 ppm of oil overboard.

## LEGAL FRAMEWORK

5. The United States is part of an international regime that regulates the discharge of oil from vessels at sea: the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (together "MARPOL"). MARPOL is embodied in agreements that the United States has ratified and has been implemented in the United States by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901, *et seq*. APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or regulations promulgated under APPS. These regulations apply to all commercial vessels operating in the navigable waters of the United States or while in a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States.

6. MARPOL Annex I established international standards governing the treatment and disposal of oily mixtures generated from the machinery spaces of a vessel. Under MARPOL, machinery space waste may be discharged overboard into the ocean only if it does not exceed fifteen (15) ppm of oil and the ship has in operation required pollution prevention equipment, to include oil filtering equipment an alarm and an automatic stopping device known as an Oily Water Separator and Oil Content Monitor to prevent the discharge of a mixture containing more than 15 ppm oil, the legally permitted concentration of oil.

7. Consistent with the requirements contained in MARPOL, APPS regulations require that vessels such as the M/V *Aquarosa* maintain a record known as an Oil Record Book in which the disposal of oil residue and the discharge overboard and disposal otherwise of oily

mixtures, slops from bilges and bilge water that has accumulated in machinery spaces must be recorded. 33 C.F.R. § 151.25(d). Discharges from the machinery spaces must be fully and accurately recorded in the Oil Record Book without delay by the person in charge of the operations. 33 C.F.R. §§ 151.25 (d) and (h). The Oil Record Book also must record any emergency, accidental, or other exceptional discharges of oil or mixtures, including a statement of the circumstances, and reasons for, the discharge. 33 C.F.R. § 151.25(g). The Oil Record Book must be maintained onboard the vessel for not less than three years, and be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25 (k).

8.      The United States Coast Guard (U.S. Coast Guard), an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under Title 14, United States Code, section 89(a) to board vessels and conduct inspections and investigations of potential violations and to determine compliance with the MARPOL, APPS, and related regulations. In conducting inspections, U.S. Coast Guard personnel rely on the statements of the vessel's crew and documents, including information contained in the Oil Record and Garbage Record Books. The U.S. Coast Guard is specifically authorized to examine a vessel's Oil Record Book. 33 C.F.R. §§ 151.23(a)(3) & (c).

### The Charge

9.      Between on or about February 3, 2011, and on or about February 22, 2011, in the Port of Baltimore and within the District of Maryland, and elsewhere, the defendant,

**ANDREAS KONSTANTINIDIS**

knowingly altered, concealed, covered up, falsified and made false entries in the Oil Record Book for the *M/V Aquarosa* with the intent to impede, obstruct and influence the investigation

and proper administration of a matter within the jurisdiction of the United States Coast Guard and the Department of Homeland Security. Specifically, during a vessel inspection of the *M/V Aquarosa* to determine the vessel's compliance with United States law the defendant made and used a false and fictitious Oil Record Book for the ship that contained false entries claiming the proper use of required pollution prevention equipment including the Oily Water Separator and Oil Content Monitor and the Incinerator, and concealing by omission internal transfers knowing then and there that the his entries in the Oil Record Book were not true and correct.

All in violation of Title 18, United States Code, Section 1519.

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY
DISTRICT OF MARYLAND

Dec 1, 2011
Date

IGNACIA S. MORENO
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT & NATURAL
RESOURCES DIVISION

Dec 1, 2011
Date